J-A18028-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.W., A MINOR A/K/A A.L.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | No. 619 EDA 2018 |

Appeal from the Order January 17, 2018
in the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-001181-2014,
CP-51-AP-0000632-2017, CP-51-DP-0001212-2014

BEFORE:   STABILE, J., STEVENS, P.J.E.*, and STRASSBURGER, J.**

MEMORANDUM BY STEVENS, P.J.E.:            **FILED SEPTEMBER 20, 2018**

Appellant, A.W. ("Father"), files this appeal from the order entered on January 17, 2018, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating Father's parental rights to his minor, dependent daughter, A.L.W. ("Child"), born in May 2005, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1]  Father further appeals from

_____

* Former Justice specially assigned to the Superior Court.

** Retired Senior Judge assigned to the Superior Court.

[1] By separate order, also entered on January 17, 2018, the trial court voluntarily terminated the parental rights of Child's mother, E.J.I. ("Mother"). Mother has not filed an appeal and is not a party to the instant appeal.

the order changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2]  After a careful review, we affirm.

The trial court summarized the relevant procedural and factual history as follows:

**Factual and Procedural Background:**

DHS became involved with this family on April 4, 2014, when DHS received a Child Protective Services ("CPS") report alleging that Child was sexually abused by Mother; Child was afraid to return home; Child disclosed the abuse to her maternal grandmother; [M]aternal [G]randmother told Child to inform a school authority the next day.  This report was indicated.  Child began residing with [M]aternal [G]reat-grandmother on April 4, 2014.  On April 8, 2014, Child completed an evaluation at the Philadelphia Children's Alliance ("PCA").  Child was subsequently referred to Children's Crisis Treatment Center ("CCTC") for therapeutic services.  Father's whereabouts were unknown at that time.

_____

[2] While Father additionally appeals from the order changing Child's permanency goal to adoption, we observe that, although stated on the record at the conclusion of the hearing on January 17, 2018, that Child's permanency goal is changed to adoption, **see** Notes of Testimony ("N.T."), 1/17/18, at 21, the Permanency Review Order entered on January 17, 2018, does not indicate a goal change.  Moreover, any such opposition would be waived as Father failed to include this issue in the Statement of Questions Involved section of his brief and failed to present argument as to this issue in his brief.  **See Krebs v. United Refining Co.**, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). **See also In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011 (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). Regardless, even if such a claim as to goal change were viable, we would have found it lacked merit.  For the reasons stated within as to termination of parental rights, a goal change to adoption would be in Child's best interests.

On April 23, 2014, the family began receiving services through Community Umbrella Agency ("CUA") NorthEast Treatment Centers ("NET"). On April 30, 2014, a Family Support Conference was held. The parties agreed that Child would be safe in the care of [M]aternal [G]reat-grandmother, with a plan. DHS agreed to make a referral for Child to receive trauma therapy. At this time, Child's older sibling was also in the care of [M]aternal [G]reat-grandmother. Father's whereabouts were still unknown at that time.

On April 30, 2014, the initial CUA Single Case Plan ("SCP") was developed. Father did not attend or otherwise participate in this meeting. The goal for Child was to remain in the home. Father's parental objective was to contact CUA with information regarding his whereabouts. At the time of the meeting, Father's whereabouts were unknown to DHS and CUA.

Child was adjudicated dependent on June 4, 2014. The trial court ordered DHS to supervise Child's care and that CUA follow up with CCTC. Maternal [G]reat-grandmother was granted temporary legal custody ("TLC") of Child. The trial court appointed [M]aternal [G]randmother and [M]aternal [G]reat-grandmother as Child's educational surrogates.

On September 11, 2014, a permanency review hearing was held for Child. Father was not present for this hearing and his whereabouts were unknown. The trial court ordered for DHS supervision to stand; Child's caregivers to participate in therapy with her through CCTC, when appropriate, and at the recommendation of Child's therapist; TLC with [M]aternal [G]reat-grandmother to stand; and BHS [("Behavioral Health Services")] to monitor Child's treatment.

On November 4, 2014, and May 27, 2015, permanency review hearings were held for Child. Father was not present for these hearings and his whereabouts were still unknown. The trial court ordered DHS supervision of Child to stand. On July 21, 2015, the CUA SCP was revised. Father did not attend this meeting. The parental objective for Father was to contact CUA with information regarding his whereabouts. At the time of the meeting, Father's whereabouts were still unknown to DHS and CUA. Subsequently, CUA learned that Father contacted

[M]aternal [G]reat-grandmother and provided her with his contact information.

On October 15, 2015, the CUA SCP was revised again. Father did not attend this meeting. The parental objectives for Father were to contact CUA with information regarding his whereabouts. At the time of the meeting, Father's whereabouts were still unknown to DHS and CUA. However, at a later date, Father reviewed the plan and signed the revised SCP. On October 26, 2015, Father met with CUA for the first time. At that meeting, Father did not reveal his specific whereabouts to CUA. CUA later learned that Father reportedly resided in a rented room in New Jersey and was on parole for unknown reasons.

On October 27, 2015, a permanency review hearing was held for Child. Father was not present for this hearing. The trial court ordered that the new placement goal was to be a placement with a fit and willing relative after learning that CUA was exploring kinship care services with [M]aternal [G]reat-grandmother and that a kinship care referral had previously been made. DHS supervision of Child was discharged, the TLC order as to [M]aternal [G]reat-grandmother was vacated, and Child was committed to DHS. Child was to remain in [M]aternal [G]reat-grandmother's home. The trial court permitted Father to have biweekly supervised visits with Child as arranged by the parties and one of those visits to be supervised monthly by the agency. Maternal [G]reat-grandmother was ordered to keep a log of Father's visits with Child and Father was ordered to contact the agency twenty-four hours in advance of scheduled visits.

On January 27, 2016, a permanency review hearing was held for Child. Father was present for this hearing. The trial court found Child's placement continued to be necessary and appropriate and the current placement goal was for Child to return to a parent or guardian. The trial court ordered that Child remain committed to DHS; CCTC to start caregiver sessions with Father; family therapy to be implemented when appropriate; a formal SCP meeting occur within twenty days and include[d] objectives for Father as well as invitations to all appropriate parties; CUA to refer Father for appropriate services; Father to continue to participate in supervised visits with Child in [M]aternal [G]reat-grandmother's home; and the agency to continue to supervise Father's visits with Child twice per month.

On March 9, 2016, CUA had a SCP meeting. Father attended this meeting. The primary goal for Child was to return to parent, guardian, or custodian, and the concurrent goal was adoption. The parental objective for Father was to contact CUA with information regarding his whereabouts. Although Father attended this meeting, but [*sic*] he did not sign the revised SCP.

On April 6, 2016, Father was referred to ARC [("Achieving Reunification Center")] for employment, housing, and parenting. Father did not comply with this referral. On April 19, 2016, CUA had a SCP meeting. Father was present for this meeting. The primary goal for Child was to return to parent, guardian, or custodian, and the concurrent goal was adoption. The parental objectives for Father were to participate in weekly supervised visits with Child at the kinship home and attend ARC for parenting, employment, and housing. On April 12, 2016, a brief permanency review hearing was held for Child. Father was present for this hearing. The trial court ordered that Child remain committed to DHS and that Father was permitted to participate in CCTC sessions.

On June 10, 2016, CUA had a SCP meeting. Father was invited to participate in the meeting on June 3, 2016, but Father failed to attend. The primary goal for Child was to return to parent, guardian, or custodian, and the concurrent goal was adoption. Father's parental objectives remained the same as previously ordered.

On July 13, 2016, a permanency review hearing was held for Child. Father was not present for this hearing. The trial court found Child's placement continued to be necessary and appropriate, the current placement goal for Child was to return to a parent or guardian, and that reasonable efforts had been made by DHS to finalize Child's permanency plan. Father was found to be substantially compliant with the permanency plan. The trial court ordered Child to remain committed to DHS, Father was permitted to have liberal supervised visits with Child as arranged by the parties, and one of those visits to be supervised by the agency monthly. The trial court also ordered CUA to make outreach to Father, CUA was to contact the New Jersey Division of Child Protection and Permanency in reference to a courtesy home assessment of Father's home in New Jersey. Father was referred to ARC for parenting and housing, family therapy, and caregiver sessions at CCTC. A SCP meeting to occur to discuss

Child's goal [*sic*], and that Father appear at the next court hearing. On July 19, 2016, Father was re-referred to ARC.

On September 20, 2016, and December 30, 2016, CUA had another SCP meeting. Father was invited to participate in the September 20, 2016, meeting on September 13, 2016, but Father failed to attend. Father was also invited to participate in the December 30, 2016, meeting on December 23, 2016, but Father failed to attend. The primary goal for Child was to return to parent, guardian, or custodian, and the concurrent goal was adoption. Father's parental objectives remained the same as previously ordered by the trial court.

On January 11, 2017, a permanency review hearing was held for Child. Father was present for this hearing. The trial court found that Child's placement continued to be necessary and appropriate, the current placement goal for Child was to return to a parent or guardian, and that reasonable efforts had been made by DHS to finalize Child's permanency plan. Father was found to be moderately compliant with the permanency plan. The trial court ordered Child to remain committed to DHS and Father was permitted to have weekly supervised visits at the agency. The trial court also ordered Father to provide CUA with documentation regarding his efforts to locate housing and copies of his paystubs. Father was to be notified of and permitted to attend Child's medical, dental, and educational appointments.

On March 22, 2017, CUA had a SCP meeting. Father did not attend this meeting. The primary goal for Child was to return to parent, guardian, or custodian, and the concurrent goal was adoption. Father's parental objectives remained the same as previously ordered by the trial court.

Child has been involved with DHS since June 4, 2014,[3] and has been committed to DHS since October 27, 2015. Father has failed to fully comply with his SCP objectives and comply with court orders throughout the life of the case. Father lacks appropriate housing and has failed to maintain consistent and meaningful contact with Child throughout her placement. Additionally, Father has failed to consistently maintain contact

_____

3 As indicated above, this is actually the date Child was adjudicated dependent.

with DHS, CUA, and other service providers to participate in planning for Child. DHS filed a petition to involuntarily terminate Father's parental rights and change Child's permanency goal from reunification to adoption on June 7, 2017.

On January 17, 2018, the trial court held the termination and goal change trial for Child.[4] Father was not present for the trial.[5] The trial court found clear and convincing evidence to

---

[4] DHS presented the testimony of Dhyjuanae Abrams, CUA case manager, NET, N.T. at 10-18, as well as Exhibits DHS 1 through 12, *id.* at 18. Although the order terminating Father's parental rights references only Exhibit DHS 1, Order of Involuntary Termination of Parental Rights, 1/17/18, at 2, the record reflects the admission of DHS Exhibits 1 through 12, N.T. at 18. There was further a stipulation as to the facts set forth in DHS's petition, but not their veracity. *Id.* at 10. We observe that the exhibits contained with the certified record also include Exhibit A as to service to Father. Although the Notes of Testimony do not reflect that this exhibit was offered and admitted at the hearing, counsel for Father acknowledged reasonable efforts at service were made. *Id.* at 9. It was further indicated by Ms. Abrams that Father knew about the hearing. *Id.*

[5] While not present, Father was represented by counsel, Lawrence O'Connor, Esquire. In addition, Child was represented at this proceeding by the guardian *ad litem*, Joshua Weil, Esquire, who was appointed in May 2014 in connection with the dependency proceedings. Attorney Weil participated in the hearing and argued in support of termination of parental rights. N.T. at 20. Notably, the Permanency Review Order of October 20, 2017, reflects the vacation of legal counsel for Child, Marilyn Rigmaiden Deleon, Esquire, and a determination that "no conflict exists" as to Attorney Weil. Permanency Review Order, 10/20/17, at 2.

Our Supreme Court, in *In re T.S.*, ___ A.3d ___, 2018 WL 4001825 (Pa. filed 8/22/18), held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. *See also In re Adoption of L.B.M.*, _ Pa. _, 161 A.3d 172, 180 (2017) (plurality). The Supreme Court defined a child's legal interests as synonymous with his or her preferred outcome and distinct from a child's best interests, which must be determined by a court. Further, the Supreme Court held that a GAL who is an attorney may act as counsel

change the permanency goal from reunification to adoption and to involuntarily terminate Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). On February 16, 2018, Father filed this appeal [and a Pa.R.A.P. 1925(b) statement].

Trial Court Opinion ("T.C.O."), 4/13/18, at 1-5 (footnotes added).

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 [Pa.C.S.A. §] 2511(a)(1) without clear and convincing evidence of [F]ather's settled purpose to relinquish his parental claim or refusal to perform his parental duties[?]

2. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 [Pa.C.S.A. §] 2511(a)(2) without clear and convincing evidence of [F]ather's present incapacity or that any incapacity continues to exist and will not be remedied by the parent[?]

3. Whether the trial court erred by terminating the parental rights of [F]ather pursuant to 23 [Pa.C.S.A. §] 2511(b) without clear and convincing evidence that there is no parental bond between [F]ather and [the child] and that termination would serve the best interest of the child[?]

Father's Brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

_____

pursuant to Section 2313(a) so long as the dual roles do not create a conflict between the child's best interests and legal interests.

Here, as indicated, the record reveals a determination by the trial court of no conflict between Child's best interests and legal interests. **See** Permanency Review Order, 10/20/17, at 2. Further, we note Attorney Weil, who argued that termination would be in Child's best interest, cross-examined CUA case manager, Dhyjuanae Abrams, so that Child's preference to remain with Maternal Great-grandmother and to be adopted was conveyed. N.T. at 16. Therefore, we do not remand this matter. **See In re T.S.**, **supra**.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of

the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[6] We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination order pursuant to subsections 2511(a)(2) and (b), which provide as follows:

_____

[6] In its brief, DHS requests this Court affirm termination of Father's parental rights pursuant to subsections (a)(1) and/or (2), and not (a)(5) and (8), as Child was not in Father's custody at the time of adjudication. DHS' Brief at 13 n.3. As to the application of Section 2511(a)(5) and (8), we observe that the appropriate inquiry is the time of removal, not the time of adjudication. *See In re C.S.*, 761 A.2d 1197, 1200 n.5 (Pa.Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care); *see also In re Z.P.*, 994 A.2d 1108, 1123 n.2 (Pa.Super. 2010) (same).

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 11 -

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting ***In re A.L.D***., 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re A.L.D***., 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned:

> Child has been involved with DHS since [April] 2014, and committed to DHS since October 27, 2015. Father's SCP objectives throughout the life of the case were to attend ARC for housing, employment, and parenting, as well as to maintain supervised visitation with Child. (N.T. 01/17/18, pg. 11; [***See***] DHS Exhibits 3, 5-12). Father had previously participated in SCP meetings and was aware of his objectives. (N.T. 01/17/18, pgs. 11-12; [***See***] DHS Exhibits 6-8). Father failed to maintain appropriate housing for Child. Father was aware that obtaining appropriate housing was an outstanding objective. Father was referred to ARC for housing, but he did not attend and failed to secure appropriate housing. (N.T. 01/17/18, pgs. 11-12; [***See***] DHS Exhibit 12). Father has never provided CUA with documentation verifying his employment. CUA has requested that Father provide documentation verifying his employment throughout the life of the case. The trial court ordered Father to provide CUA with copies of his paystubs. (N.T. 01/17/18, pg. 12; [***See***] DHS Exhibit 12; [***See***] Permanency Review Order,

- 12 -

01/11/17). Father completed a parenting class. (N.T. 01/17/18, pg. 11). As the record establishes, at all permanency hearings, the trial court has given Father supervised visits with Child. For a longtime [*sic*], Father had supervised visits with Child at [M]aternal [G]reat-grandmother's home, but since Father was not making himself available to visits with Child, the trial court changed his visits to weekly supervised at the agency. Since the last court date of October 20, 2017, which is after the goal change and termination petitions were filed, Father became more consistent in attending supervised visits. However, for the last three weeks before the termination trial on January 17, 2018, Father was again a no-call and no-show. (N.T. 01/17/18, pg. 12). Father's visits remained supervised with Child at the agency. Father did not provide any reason to CUA as to why he missed the scheduled visits. When Father did attend the visits, he sometimes would arrive up to 20 minutes late. (N.T. 01/17/18, pg. 12). Additionally, the interactions between Father and Child are not the interactions a Father would have with a child. Father has no relationship with Child. Father and Child will play games and have some interactions during the visits, but Father and Child do not tend to have conversations with each other. Child is usually quiet when around Father during the visits. (N.T. 01/17/18, pgs. 13, 17-18). At the permanency hearing on January 11, 2017, the record establishes in the docket that Father was present in court. Father was notified that he was permitted to attend Child's medical, dental, and education appointments. . . . Father was also ordered by the trial court to start parent-caregiver sessions at CCTC on January 27, 2016. This has been an outstanding order of court and Father was present in the courtroom. As of August 2017, to the best knowledge of CUA, Father still had not made outreach to CCTC to inquire about caregiver sessions. (N.T. 01/17/18, pg. 15). Child needs permanency, which Father cannot provide. Father has demonstrated that he is unwilling to remedy the causes of his incapacity to parent in order to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Termination under 23 Pa.C.S.A. §2511(a)(2) was also proper.

T.C.O. at 8-9.

Father, however, argues a lack of current parental incapacity. Father's

Brief at 12. He states,

- 13 -

Father, A.W., has documented a present capacity to care for his child. There are no existing dependency issues. Father has appropriate housing, although neither DHS nor NET CUA provided any documentation of any efforts made to assess the suitability of [F]ather's housing. Additionally, parental rights may not be terminated solely on the basis of environmental factors such as inadequate housing. Father has resolved the issues that contributed to the placement of the child and has established his present capacity to parent his child. Father has remained clean and sober, and has no recent arrests or active criminal cases. Again, neither DHS nor NET CUA provided any documentation of any prior criminal record for [F]ather. There is no documented evidence of any possibility of [F]ather becoming incarcerated for a parole or probation violation because no evidence was offered to prove that [F]ather is currently serving a probation or parole sentence. There are no legal grounds to terminate [F]ather's parental rights under section 2511 (a)(2) because there is no clear and convincing evidence of present incapacity and all conditions that contributed to the placement of the child have been remedied.

*Id.*

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Father failed to complete his established SCP objectives. CUA case manager, Dhyjuanae Abrams, recounted Father's SCP objectives as to: attend parenting classes, maintain appropriate housing, obtain employment, and maintain visitation.[7] N.T. at 11; *see also* DHS Exhibits 8-12. Notably, as to these objectives, Ms. Abrams confirmed that she had conversations with Father about them. *Id.* at 12. Ms. Abrams acknowledged that Father had taken and completed a parenting class.

---

[7] Father's whereabouts were initially unknown and his sole objective was to contact CUA as to his whereabouts. *See* DHS Exhibits 3, 5, 6, 7; *see also* Petition for Involuntary Termination of Parental Rights, 6/7/17, Exhibit "A," Statement of Facts, at ¶¶n, t, w, bb.

*Id.* at 11. However, she testified that, as of the time of the hearing, Father did not have appropriate housing. *Id.* Moreover, she indicated Father was aware that housing was an objective and he had been referred to ARC. *Id.* Further, despite requests "throughout the life of the case," Father failed to provide updated employment documentation. *Id.* at 12.

As to visitation, at the time of the hearing, Father was afforded weekly supervised visitation at the agency. *Id.* Father previously had liberal supervised visitation at the home of Maternal Great-grandmother, to include a monthly visit supervised by the agency. *See* Permanency Review Order, 7/13/16. However, this was later changed to weekly supervised visitation at the agency. *See* Permanency Review Order, 1/11/17. Although Ms. Abrams testified that Father attended ten of twelve visits since the last court hearing, she reported that he missed the last three weeks without reason. N.T. at 12. She testified as follows:

> Q. And has he made every visit since the last court date?
>
> A. No.
>
> Q. How many did he make?
>
> A. Ten out of twelve, but for the last three weeks – he missed the last three weeks.
>
> Q. Do you know why he's missed?
>
> A. No, just no call, no show.

*Id.* Moreover, Ms. Abrams revealed that Father usually presents for visitation twenty minutes late, *id.* at 12, and does not interact with Child the entire visit.

*Id.* at 13, 17. Ms. Abrams stated, "They don't really have the relationship, like the conversations." *Id.* at 13.

Lastly, Ms. Abrams testified that Child is receiving mental health services through CCTC. *Id.* at 14. Pursuant to court order, CCTC was to commence caregiver sessions with both Mother and Father, and Father was permitted to participate in Child's sessions. *See* Permanency Review Orders, 1/27/16 and 4/21/16. Ms. Abrams indicated that Father is not participating in these sessions and has not contacted CCTC. N.T. at 14-15.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

- 16 -

To the extent that Father's argument may be read to include an assertion of a lack of reasonable efforts on the part of the agency, this argument is without merit. When reviewing a termination order on appeal, we do not consider whether the agency made reasonable efforts. Our Supreme Court has rejected the argument that the provision of reasonable efforts by the county children's services agency is a factor in termination of the parental rights of a parent to a child. *See In the Interest of: D.C.D.*, 629 Pa. 325, 343-45, 348, 105 A.3d 662, 673-74, 676 (2014) (rejecting the suggestion that an agency must provide reasonable efforts to enable a parent to reunify with a child prior to the termination of parental rights, and rejecting the suggestion that Section 2511 of the Adoption Act should be read in conjunction with Section 6351 of the Juvenile Act, particularly Section 6351(f)(9)(iii)).

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as

discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Father's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

Father currently has weekly, supervised visits with Child at the agency. As the record establishes, at all permanency hearings, the trial court has given Father supervised visits with Child. For a longtime, Father had supervised visits with Child at [M]aternal [G]reat-grandmother's home, but since Father was not making himself available to visits with Child, the trial court changed his visits to weekly supervised at the agency. Since the last court date of October 20, 2017, which is after the goal change and termination petitions were filed, Father became more consistent in attending supervised visits. However, for the last three weeks before the termination trial on January 17, 2018, Father was again a no-call and no-show. (N.T. 01/17/18, pg. 12). Father did not provide any reason to CUA as to why he missed the scheduled visits. When Father does attend the supervised visits, he sometimes will arrive up to 20 minutes late. (N.T. 01/17/18, pg. 12). The interactions between Father and Child are not the interactions a Father would have with a child. Father has no positive, healthy, paternal relationship with Child. Father and Child will play games and have some interactions during the visits, but Father and Child do not tend to have conversations with each other. Child is usually quiet when around Father during the visits. (N.T. 01/17/18, pgs. 13, 17-18). Child refers to Father as "Uncle" instead of "Father." There is no positive, healthy, paternal bond between Father and Child. (N.T. 01/17/18, pg. 13). Child is twelve-years-old and is currently placed in the home of [M]aternal [G]reat-grandmother, where she is doing well in the home. Child is up-to-date on medical and immunizations, attending school, and receiving mental health services at CCTC, while in [M]aternal [G]reat-grandmother's care. (N.T. 01/17/18, pgs. 13-14). Child has informed CUA that she is aware that she will be adopted and that she wants to remain with [M]aternal [G]reat-grandmother permanently. Child does not want to reside with Father. Child has resided with [M]aternal [G]reat-grandmother since April 2014. Child wants to be adopted by [M]aternal [G]reat-grandmother. (N.T. 01/17/18, pg. 16). Father has never participated in Child's mental health services at CCTC. Father was also ordered by the trial court to start parent-caregiver sessions at CCTC on January 27, 2016. This has been an outstanding order of court and Father was present in the courtroom. As of August 2017, to the best knowledge of CUA, Father still had not made outreach to CCTC to inquire about caregiver sessions. (N.T. 01/17/18, pg. 15). At the permanency hearing on January 11, 2017, the record establishes in the docket that Father was present in court. Father was notified that he was permitted to attend

- 19 -

Child's medical, dental, and education appointments. . . . Child receives love, safety, and comfort in [M]aternal [G]reat-grandmother's home. (N.T. 01/17/18, pgs. 14-15). There would be no irreparable harm to Child if Father's parental rights were terminated. (N.T. 01/17/18, pg. 13). The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Father and Child. The DHS witness was credible. The trial court's termination of Father's parental rights to Child under 23 Pa.C.S.A. §2511(b) was proper and there was no error of law or an abuse of discretion.

T.C.O. at 14-15.

Father, however, argues that he maintained consistent visitation and has a bond with Child. He further blames DHS and NET for any breakdown in his relationship with Child. Father's Brief at 13. Specifically, he avers:

Father and the child have a strong emotional bond. Father frequently and consistently visited with the child while she was placed with caregiver. The failure of the caseworker from NET CUA and DHS to initially notify [F]ather and make reasonable efforts toward full and proper reunification interfered with [F]ather's ability to further strengthen his emotional bond with his daughter. The child's developmental, physical and emotional needs and welfare suffered as a result of the Department's failure to make reasonable efforts.

There are no legal grounds to terminate [F]ather's parental rights under section 2511 (b) because there was no clear and convincing evidence offered at trial to establish that termination would serve the best interest of the child. Father has established a strong emotional bond between him and his child. Termination of [F]ather's parental rights would not best serve the developmental, physical and emotional needs of the child. Father's ability to deepen and strengthen the bond between him and the child[] was limited by the actions of the Department of Human Services.

*Id.*

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical and

emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the lack of a bond between Father and Child such that, if severed, would not have a detrimental impact on her.

Significantly, as indicated above, Father missed visitation, which had been changed to weekly supervised visitation at the agency, the last three weeks prior to the hearing without reason or explanation, N.T. at 12, and is sometimes twenty minutes late for visitation and does not interact with Child the entire visit, *id.* at 12, 13, 17. Further, Ms. Abrams observed that Father's relationship with Child is not a father-child relationship, indicating, ". . .[I]t's not like a real relationship as a father, like a father relationship. I think she really refers to him as like her uncle. . ." *Id.* at 13. Ms. Abrams further noted the lack of a positive, healthy paternal relationship.[8] *Id.* As such, Ms. Abrams opined that there would not be irreparable harm to Child if Father's parental rights were terminated. *Id.*

Moreover, Ms. Abrams also indicated that Child, who was twelve years old, wants to remain with and be adopted by her maternal great-grandmother. *Id.* at 16. At the time of the hearing, Child had been residing with Maternal Great-grandmother for almost four years and fully committed to DHS for over

---

[8] Ms. Abrams testified that she supervised the last visit between Father and Child, and spoke with Child during home visits regarding her relationship with Father. N.T. at 16.

two years. *Id.* at 19-20. Child was doing well and up-to-date medically. *Id.* at 13-14.

Thus, as confirmed by the record, termination of Father's parental rights serves Child's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Father may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, Child had been residing with and in the care of Maternal Great-grandmother for almost four (4) years and is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/20/18</u>